.(C. D. 657)

RITTER CARLTON CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 1, 1942)

*Puckhafer, Rode & Rode* (*Howard C. Carter* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before T<span>ILSON</span>, K<span>INCHELOE</span>, and D<span>ALLINGER</span>, Judges .

D<span>ALLINGER</span>, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted upon a particular importation of steel tape measures. Duty was levied thereon at the rate of 45 per centum ad valorem under the provision in paragraph 396 of the Tariff Act of 1930 for steel rules. It is claimed that certain of said articles are properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as machines not specially provided for; or, alternatively, that all of said articles are properly dutiable at the rate of 40 per centum ad valorem under paragraph 339 of said act as household utensils of the kind therein made dutiable at the latter rate.

At the first hearing, held at New York on November 10, 1941, a sample of the merchandise represented by item 1017 on the invoice accompanying the entry covered by this protest was admitted in evidence as plaintiff's exhibit 1; a representative sample of the articles invoiced as item 1033 was admitted in evidence as plaintiff's exhibit 2; and a sample of the articles invoiced as item 1200 was admitted in evidence as plaintiff's exhibit 3.

At the second hearing, held at New York on January 12, 1942, it was stipulated by and between counsel for the respective parties in open court that said exhibits 1, 2, and 3 were composed wholly or in chief value of a base metal which was neither aluminum nor iron or steel enameled or glazed with vitreous glasses, and not plated with platinum, gold, or silver, or colored with gold lacquer.

The plaintiff then offered in evidence the testimony of Herbert F. Ritter, a partner in the firm of Ritter, Carlton Co., the plaintiff herein, who testified that he was thoroughly familiar with articles similar to exhibits 1, 2, and 3; that he had used them himself in his home to measure for curtains and for hanging pictures; that he had seen said articles used by other people for the same purpose, and also for measuring for carpets in the home; that he had never seen an article like exhibit 1 used anywhere except in the household; that he had used an article like exhibit 2 in his home; that he had seen salesmen carry articles like exhibits 2 and 3 in their pockets; and that he was familiar with the mechanism of exhibits 2 and 3 by taking them apart.

The witness then proceeded to testify in part as follows:

Q. From having taken them apart, have you become familiar with the mechanism?—A. Yes, sir.

Q. Describe what it is.

\*     \*     \*     \*     \*     \*     \*

. A. This tape is composed of a binding post, around which is wound a winding spring, a piece of flat steel spring, and that, in turn, is attached to a little drum,

which is attached to the tape. There is a ratchet attachment. You release the ratchet and, zip, back comes the tape (illustrating). You can hear the ratchet.

Q. Now to whom did you sell Exhibit 1 and merchandise identical with Exhibit 1?—A. Well, that is a syndicate store number—Woolworth's, Kress's, Kresge's, Murphy's; that kind of store.

Q. To whom did you sell Exhibits 2 and 3 and merchandise identical with them?—A. No. 2 we sold to all the syndicates, and No. 3 we sold almost entirely to Sears, Roebuck &· Company, they were our best customer for that.

At this juncture a sample of a 1-foot steel rule was admitted in evidence as plaintiff's illustrative exhibit A. The witness then proceeded to testify in part as follows:

Q. Under what name or names have you sold merchandise like Exhibits 1, 2, and 3?

\* \* \* \* \* \* \*

A. Well, we sold them under four or five names. They have been called "Flex-Rigid Tapes"; called "Coilable Metal Rules"; called "Flexible Steel Rules."

By Judge DALLINGER:

Q. You have sold them under all of those names?—A. Yes, sir.

By Judge TILSON:

Q. You say you applied for a patent?—A. I applied for a patent on Exhibit 1. That is my patent.

By Judge KINCHELOE:

Q. This member of the court is going to ask you your definition of a rule, with an exception to the Government.—A. My definition of a rule is a straight-edge, similar to Illustrative Exhibit A, something you use to draw a straight line with, to rule a line.

The Government then offered in evidence the testimony of three witnesses. The first, Roy C. Schmidt, district manager of Stanley Tools, who testified that he was familiar with merchandise represented by exhibits 1, 2, and 3; that he had sold such articles as steel tape rules; that he had seen them used by a plumber in measuring circumferences and by carpenters in measuring boards; and that they were peculiarly adaptable for measuring irregular surfaces.

On cross-examination the witness testified in part as follows:

X Q. Did you ever see a high-class mechanic use anything except a Lufkin or Stanley rule?—A. Yes, sir.

X Q. What other types?—A. Master rule.

X Q. Are they the same or better quality than Exhibits 1, 2 and 3?—A. I never compared them, but would say a little better.

\* \* \* \* \* \* \*

X Q. Referring to Exhibit 1, did you ever see a mechanic use a rule or tape measure which did not return by itself, by its own action?—A. Yes.

\* \* \* \* \* \* \*

X Q. A man comes into a store, and how do you know he is a mechanic?—A. By his clothes, overalls, the whole set-up; you can see it.

By Judge DALLINGER:

Q. How do you know he isn't buying it for his wife at home?—A. Well, I know his wife never uses a steel tape like that; it is too sharp.

By Mr. CARTER:

X Q. Why do you say it is too sharp?—A. The edges here (indicating). A woman doing dressmaking would use a linen tape. When you go out into a store and try to sell a woman a steel-blade item for 40 cents against a linen tape for 10 cents, you are going to have to do some selling.

X Q. Have you ever used a steel tape to measure curtains?—A. Yes, sir.

\* \* \* \* \* \* \*

X Q. With any one of Exhibits 1, 2, and 3, to measure the height of curtains, you can make that measurement without climbing up on a chair? A. Yes, sir.

X Q. And with a tape measure it would be necessary to climb up on a chair or ladder, or something of that sort, wouldn't it?—A. No; you could take a 6–foot wooden rule.

The second Government witness, William S. Speir, manager of the New York branch of the Lufkin Rule Co., testified that he had been familiar with articles like exhibits 1, 2, and 3 since 1927 or 1928; that he had sold such articles to the wholesale trade; that his experience as salesman had been principally in connection with industrial plants; that he had seen a great many of such articles used in steel mills and machine shops; that such articles are peculiarly adaptable for the measuring of irregular surfaces; that he had seen such articles used in his own home; and that he had brought with him a so-called dressmaker's tape, which was admitted in evidence as defendant's illustrative exhibit B.

The witness then proceeded to testify in part as follows:

Q. Now, Mr. Speir, you have stated that you have seen the steel rules similar to Exhibits 1, 2 and 3 used, both in shops by mechanics and in the home. Which use is the more predominant, in your experience?—A. I don't think there is any question but what the shop use is the more predominant, \* \* \*.

Q. Would you say that use is very much more predominant?—A. Very much more. As a matter of fact, we don't make that class of material with the thought of it being a domestic item. We \* \* \* were the originators of this particular type, Exhibit 3, and we brought it out for mechanics' uses. \* \* \* It is too high priced for the market to be practical for home consumption, as we make it, and we have never endeavored to make a cheaper one of that type, because we don't think it would be worthwhile.

By Judge DALLINGER:

Q. Do you know of some of that same construction made cheaper?—A. Unfortunately, I do.

By Mr. FitzGibbon:

Q. Would you say the cheaper ones were made to compete with yours in shops or in the home?—A. In view of the fact that that is where they hurt us, I would say they were made to compete in the shops.

On cross-examination the witness testified in part as follows:

X Q. The Lufkin Rule Company makes very high-class merchandise, doesn't it?—A. I think so.

X Q. When you have been on selling trips, you have never had anything like Exhibits 1, 2 and 3 to sell, have you?—A. No, we don't make that grade.

X Q. Now, I believe you stated you had an exhibit like Exhibits 1, 2 or 3 in your home?—A. Yes, sir.

X Q. You have used that there for making various measurements at one time or another?—A. I may have; I couldn't say definitely. I have used a yard stick mostly around the house. We also make those.

X Q. Now, Illustrative Exhibit B isn't the only home measuring device you know of, is it?—A. No.

At this juncture the witness produced a roll of cotton tape encased in a brass container without a spring, which was admitted in evidence as plaintiff's illustrative exhibit C.

The third and last witness for the Government, Robert Watson, a tool demonstrator and part-time salesman in the employ of the Stanley Tool Co., testified that for the last 4 years he had been demonstrating rules similar to exhibits 1, 2, and 3 in manual training schools and factories of various kinds; that such articles were useful for measuring circumferences, rectangles, and irregular surfaces; that he had always known articles like exhibits 1, 2, and 3 as flexible steel tapes; that in his opinion the term "tape" was synonymous with the word "rule;" and that he had never seen articles similar to exhibits 1, 2, and 3 used in the home.

On cross-examination the witness testified in part as follows:

X Q. Does the Stanley Tool Company sell any of their tape measures to ten-cent stores?—A. I don't know. I don't sell to ten-cent stores.

X Q. And they don't sell to ten-cent stores because they want a lot more money for their products?—A. I don't think you can buy this for ten cents either.

At the last hearing, held at New York on February 9, 1942, the plaintiff called four witnesses. The first, Carl Metzler, vice president of the Strauss-Eckardt Co., testified that he had been familiar with merchandise similar to exhibits 1, 2, and 3 for the last 10 years, having imported and sold such articles; that 90 per centum of his sales of such articles were made to syndicated stores, such as McCrory's and Murphy's and that he had used articles like exhibits 1 and 2 in his own home on many occasions.

The plaintiff's second witness, William F. Trainor, testified that he was familiar with articles like exhibits 1 and 2 for the last 3 years, having used them in his home for measuring floors for rugs, linoleum, etc.

On cross-examination he testified in part as follows:

X Q. You use other tools around your house?— A. Yes.

  *    *    *    *    *    *    *

X Q. You keep them in a tool box?—A. That is right.

X Q. And you keep this with them?— A. No, my wife grabbed this, and keeps it in her sewing basket.

X Q. You kept it in with your tools before she grabbed it?—A. Yes.

The next witness, Barnett Skolnick, testified that he had been familiar with articles like exhibits 1 and 2 for the last 8 years; that he had used them for measuring floor covering, electric wiring, and

shelving in his own home; that he had seen his brothers use them in their homes for the same purpose; and that he had never seen them used anywhere else.

On cross-examination the witness testified in part as follows:

X Q. You use other tools besides this ruler?—A. Yes.
X Q. You keep them all together in a box?—A. I keep the other tools together.
X Q. What did you do with the ruler?—A. We keep it in a drawer where it is convenient to get it in the kitchen.
X Q. With the screw driver and hammer perhaps?—A. Yes.

The last witness, Carl Nylen, testified that he had been familiar with articles like exhibits 1 and 2 for 9 years; that he had used such articles in his own home for measuring linoleum to be laid on a kitchen floor; that his wife had used them for measuring curtains and shades; that he had seen his brother-in-law use such articles for measuring partitions in his home; and that he had never seen such articles used anywhere else.

On cross-examination he testified that he kept the articles similar to exhibits 1 and 2 in a kitchen drawer with knives, forks, and spoons, but not with the hammer and screw driver.

Upon this record counsel for the Government in his brief filed herein contends that all of the steel tape measures or rules involved herein were properly classified by the collector under the *eo nomine* provision in paragraph 396 of the Tariff Act of 1930 for rules, and stresses the fact that "the merchandise herein is invoiced as 'Steel-Rules.'" While it is true that in the private invoice in the official papers the merchandise is so designated, nevertheless the consular invoice description is "tape measures." Evidently the two terms are used interchangeably by the exporter of said merchandise. The same is true of the testimony of the plaintiff's principal witness. He testified that said articles are called flex-rigid tapes, coilable metal rules, and flexible steel rules.

While it is true that some dictionary definitions would seem to exclude coiled steel rules from the term "rule," nevertheless we are satisfied that the articles constituting the imported merchandise at bar are rules of a certain kind. *Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T. D. 38966. Considering all of the evidence, however, including not only the testimony of the witnesses, but also the kind of stores selling the articles, and the appearance of the samples thereof, we are of the opinion that the rules or tapes represented by exhibits 1 and 2 are of the character chiefly used in the home, rather than by mechanics and other workers, and we so find.

Inasmuch, therefore, as it is well established that a use provision takes precedence over one containing words of general description or even over an *eo nomine* designation, we hold as a matter of law that the steel rules, represented by items 1017 and 1033 on the invoices

accompanying the entries covered by this suit, are properly dutiable at the rate of 40 per centum ad valorem under paragraph 339 of the Tariff Act of 1930 as household utensils of the kind therein made dutiable at that rate, as alleged by the plaintiff. That claim is therefore sustained.

However, in regard to the tape measures or rules represented by exhibit 3, although said articles are mechanical contrivances which utilize and apply energy or force for the transmission of motion, and as such would be included within the definition of a machine judicially enunciated in the case of *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, nevertheless, we are of the opinion that such rules not being chiefly used in the home are therefore more specifically provided for under the *eo nomine* provision therefor, as rules, under paragraph 396 of said act, rather than as machines not specially provided for in paragraph 372, as alleged by the plaintiff.

We therefore hold as a matter of law that the steel rules or tape measures, represented by item 1200 on the invoice accompanying the entry covered by this suit, are properly dutiable at the rate of 45 per centum ad valorem under said paragraph 396, as rules, as classified by the collector. Judgment will be rendered accordingly.