(C. D. 1075)

REMINGTON RAND, INC. *v.* UNITED STATES

(1)

## United States Customs Court, Second Division

(Decided December 22, 1947)

*Garey, Desvernine & Kissam* (*Ambrose V. McCall* and *Eugene L. Garey* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: Plaintiff imported from Canada certain articles described on the invoice and entry as "Stator Rivets" and "Rotor Rivets" for use in the manufacture of electric shavers. Duty was assessed thereon by the collector of customs at the rate of 45 per centum ad valorem under the provision in paragraph 397 of the Tariff Act of 1930 for —

Articles or wares not specially provided for * * * if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, * * *.

Plaintiff contends in its protest that the merchandise is properly dutiable at the rate of 1 cent per pound under the provision in paragraph 332 of said act for rivets of iron or steel, or by similitude thereto, pursuant to the provisions of paragraph 1559 of said act. If not so dutiable, the plaintiff invokes the applicability of the provisions of paragraph 1558 of said act for unmanufactured articles not enumerated or provided for, dutiable at the rate of 10 per centum ad valorem, or for articles manufactured, not specially provided for, upon which the ad valorem rate of duty is 20 per centum.

By amendment to its protest, the plaintiff subsequently claimed in the alternative that the importation was dutiable as bolts or bolt blanks at the rate of 1 cent per pound under paragraph 330 of the Tariff Act of 1930, or as round iron or steel wire at 20 per centum ad valorem under the provisions of paragraph 316 (a) of said act, as modified by the trade agreement with Sweden effective August 5, 1935 (68 Treas. Dec. 19, T. D. 47785).

The proof offered by the plaintiff at the hearing in this case was limited to the claims made under paragraphs 332 and 330, *supra,* the pertinent provisions of which read as follows:

PAR. 332. * * * rivets of iron or steel, not specially provided for, 1 cent per pound.

PAR. 330. * * * bolts, with or without threads or nuts, and bolt blanks, of iron or steel, 1 cent per pound; * * *.

Other claims made by the plaintiff, not having been supported by any proof, are overruled.

Samples of the articles in controversy were admitted in evidence as collective exhibits 1 and 4. From the record made at the hearing and from visual examination of the exhibits, it is found that the articles consist of short, solid lengths of soft iron wire. The ones referred to on the invoice as "Stator Rivets," represented by collective exhibit 1, measure .598 of 1 inch in length, with a plus or minus tolerance of .003 of 1 inch, and .093 of 1 inch in diameter, with no plus tolerance and a minus tolerance of .002 of 1 inch. The articles described on the invoice as "Rotor Rivets," as exemplified by collective exhibit 4, have the following dimensions: .529 of 1 inch in length, with a tolerance allowance of plus or minus .003 of 1 inch, and .093 of 1 inch in diameter, with no plus tolerance and a minus tolerance of .002 of 1 inch.

Testimony of two witnesses was offered on behalf of the plaintiff and of one witness in support of the Government.

The first witness for the plaintiff was Louis C. Carissimi, a mechanical engineer in the employ of the importer herein and designer of the articles in controversy and of the electric shaver of which they ultimately form parts. He testified that the articles represented by collective exhibits 1 and 4 are made of soft iron, not machined, lathed, or brightened; that they could not be used for nonskidding automobile tires (also enumerated in paragraph 332, *supra*); that the manner of their use is under his personal direction and supervision; and that collective exhibit 1 is a headless rivet used in the stator of the motor of the electric shaver to hold together a multiplicity of laminations. Describing how articles like collective exhibit 1 are used, he stated:

> There is a special fixture made which is properly positioned under a punch press, and a fixture which slides out a predetermined thickness of a pile of laminations into a properly positioned spot under and over which there are special punches. The operator inserts a pin in each of the holes provided for the purpose. The press is tripped, laminations are tightly wedged together, and the rivets are headed on both sides.

The witness testified that the articles of which collective exhibit 4 is a sample are similarly used but in a different part of the electric shaver motor. He further stated that whereas collective exhibit 1 holds together about twenty-four laminations, collective exhibit 4 clinches together about twenty laminations. The witness testified further that the articles are made headless "Because it lends itself to our method of heading the rivet in handling, which is a lot better, cheaper, and quicker than using one with a head on one end."

Admitted in evidence as plaintiff's exhibits 2, 3, and 5 were orders by the plaintiff herein on the Scott Tool & Machine Limited of Montreal, Canada, and bill of said Scott Tool & Machine Limited covering the shipment in controversy. From these exhibits it is observed that the articles in issue were ordered and billed as "Stator Rivets," and "Rotor Rivets" or "Armature Rivets."

When asked whether collective exhibit 1 could be used as a blank bolt, this witness replied: "For other purposes, perhaps." He further stated that he had never seen articles like collective exhibit 1 until he had conceived their manufacture and knew of no use or purpose to which they are put other than as rivets used in the manufacture of electric shavers.

The second witness for the plaintiff was W. Dudley Clark, assistant general manager of the Remington Rand Electric Shaver Division, who is in charge of purchases. He testified that during the year and a half that he has been making purchases for the plaintiff herein he has bought between ten and fifteen million rivets like collective exhibits 1 and 4. Purchases of these articles as rivets were made and estimates received from various suppliers in the United States, whom he named, until there came a time when it was difficult to procure this merchandise in the United States. The witness further testified that he had never heard the articles referred to as anything other than as rivets and as far as he knows they cannot be used for anything else than as rivets.

Introduced in evidence as plaintiff's collective exhibit 6 is a purchase order and an invoice covering a shipment from the Fairway Spring Co. of Elmira, New York, to the plaintiff herein, of articles stated by Mr. Clark to be similar to collective exhibit 4, supra. The purchase order and invoice describe the articles as "Rivets."

The witness further testified that collective exhibit 1 or 4 might become a bolt by having a thread put on one end and a nut or head on the other end. He stated that the articles could be described as blank bolts but that in the condition as imported they could not be used in any other way than as rivets.

Testimony of Joseph A. Radler was then offered on behalf of the defendant. Mr. Radler stated that he has been manager of the Newark Rivet Works, Newark, N. J., for the past 5 years, and for 41 years prior thereto he was accountant for said firm. His firm manufactures pins, rivets, studs, umbrella frames, and bag frames. He testified that the Newark Rivet Works manufactures products similar to collective exhibits 1 and 4 and that they term them headless pins. He further testified that in all his experience he does not know of any articles termed rivets which do not have a so-called head to keep them from slipping through a hole. The witness stated that

articles like collective exhibits 1 and 4 were bought and sold and known in the trade either as headless pins or cut wire.

On cross-examination, the witness testified as follows:

X Q. What did they use these headless pins of yours for, do you know?—A. That I couldn't very well tell you because we just get blueprints and we make the rivets according to the print and we don't go into the use.

X Q. Do you know, other than from hearing testimony while you sat here, could you look at Exhibits 1 and 4 and tell what use they could be made into?—A. I only—we sell some of these to people who make locks.

X Q. What do they use headless pins for mainly?—A. They hold the two parts of the lock together.

X Q. Can they, by hammering in the head, make a rivet?—A. They could, yes.

X Q. What is your distinction between a headless pin and a headless rivet?—A. Well, in my experience at our plant and from the business we have transacted, we have always called them headless pins.

X Q. Is that a matter of preference with you; you just call them pins?—A. It is just that we call them—they are termed to us as headless pins; wires.

X Q. Cut from soft iron wires?—A. Yes.

X Q. And, if I call them a headless rivet, would that be anything—any direct departure from your own?—A. No.

X Q. Could they be bolts?—A. Well, when you talk bolts, a bolt is always meant as something a little heavier in diameter than a rivet.

\*     \* .     \*     \*     \*     \*     \*

On redirect examination, the witness further testified that from his personal observation of the locks being put together, the ends of the headless pins are hammered over and form sort of a burr or small head, and that the pins are used to perform practically the same function as was described by the plaintiff's witnesses.

Defendant's counsel in his brief argues that a rivet is a "headed pin" and that the articles here under consideration being headless cannot be rivets, and therefore do not come within the purview of paragraph 332, *supra.*

Neither of the parties here contends that there is any peculiar or restricted trade meaning of the term "rivets" different from its common ordinary meaning. Hence we may proceed upon the assumption that the common and commercial meanings are the same. *Swan* v. *Arthur,* 103 U. S. 597; *Schmieder* v. *Barney,* 113 U. S. 645; *Nix* v. *Hedden,* 149 U. S. 304; *Bakelite Corporation et al.* v. *United States,* 16 Ct. Cust. Appls. 378, T. D. 43117; *United States* v. *Fung Chong Co.,* 34 C. C. P. A. (Customs) 40, C. A. D. 342. In the *Nix* v. *Hedden* case, *supra,* where the question for determination was whether tomatoes should be classified as "vegetables" or as "fruit," the court remarked:

There being no evidence that the words "fruit" and "vegetables" have acquired any special meaning in trade or commerce, they must receive their ordinary

meaning. Of that meaning the court is bound to take judicial notice, as it does in regard to all words in our own tongue; and upon such a question dictionaries are admitted, not as evidence, but only as aids to the memory and understanding of the court. [Citing cases.]

· Our attention has been invited by counsel for the parties herein to various lexicographic definitions of the word "rivet." The plaintiff cites the following:

Webster's Daily Use Dictionary (Crosset & Dunlap, 1932 Edition) * * *

*rivet*, n. a short metal bolt clinched by hammering.

* · * * * * * ·*

Funk & Wagnalls New Standard Dictionary, 1932 Edition * * *

*rivet*—a short soft metal pin having *usually* a head on one end, used to connect two plates of metal or other substance together by passing it through holes and spreading its headless end by hammering or pressing until a second head is formed. [Italics quoted.]

Webster's Collegiate Dictionary, Abridged, 1904 Edition * * *

*Rivet*, N. A metallic pin or small bolt, usually with a head, *used for fastening things together by beating down or clinching one or both of its ends*. [Italics quoted.]

In its brief the following definitions are cited by defendant:

Webster's New International Dictionary, Second Edition 1935 * * *

*rivet*—A headed pin or bolt of some malleable material, as wrought iron, soft steel, or copper, used for uniting two or more pieces by passing the shank through a hole in each piece and then beating or pressing down the plain end so as to make a second head. Small rivets are usually closed cold, but larger rivets are closed at a forging heat. Rivets are distinguished by the shape of their heads, as *pan-head, conehead, buttonhead, flathead, steeple-head, flush-head*, and *countersunk-head rivets*, and by their use, as *structural, tinner's, belt*, etc.

* * * * * * *

Knight's American Mechanical Dictionary Vol. III at page 1947 * * *

*Rivet. (Machinery)* A short bolt with a flat or rose head, employed for uniting two plates or thin pieces of material together. The stub end is swaged to prevent its withdrawal. When used for joining pieces of leather, as in making belting, an annular disk, termed a *burr*, is placed over this end previous to swaging, in order to give a greater bearing.

Rivets are cut from round metal rods, and formed by special machinery.

* * * * * * *

Dictionary of Tariff Information (1924) at page 628 * * *

*Rivets,* STUDS, and STEEL POINTS. A rivet is a headed pin or bolt of metal used to unite two or more pieces by passing it through them and heading the plain end. A stud is a small pin or rod for holding members together or fitting parts to one another. A steel point, used as an ornament for ladies shoes, is a small

decorative article of steel upon whose surface are cut faceted points which reflect the light.

In addition to the foregoing, the following definition of "rivet" contained in the New Century Dictionary of the English Language (1946 Ed.) is noted—

*rivet* * * * A metal pin or bolt for passing through holes in two or more plates or pieces to hold them together, *usually* made with a head at one end, the other end being hammered into a head after insertion. [Italics supplied.]

As pointed out above, some lexicographic authorities describe a "rivet" as "a short soft metal pin having *usually* a head on one end, used to connect *two* plates of metal or other substances together * * *." [Italics supplied.] Other definitions indicate that a rivet may be used to connect two *or more* plates; still other definitions omit the word "usually" in defining a "rivet." However, it is the opinion of the court, which seems to be borne out by thoughtful consideration of various definitions of the word "rivet," that rivets may be made with or without a head on one end, and may be used to connect two plates of metal or other substances, or more than two such plates. We conclude, therefore, that the provision in paragraph 332, *supra*, for "rivets of iron or steel, not specially provided for" embraces rivets of all kinds when of the materials specified and when used in the manner above described.

In *Cabell* v. *Markham, Alien Property Custodian et al.*, 148 Fed. 2d 737, where defendants were contending that the courts were not free to depart from the literal meaning of certain words of a statute "however transparent may be the resulting stultification of the scheme or plan as a whole," Learned Hand, Circuit Judge, writing the opinion for the Circuit Court of Appeals, Second Circuit, said—

Courts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute. We need cite no others than the more recent of those in the Supreme Court which have followed Rector, etc., of Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; * * * [Citing numerous cases.]

Further, Judge Hand observed—

*. * * Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing; be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. * * *

Also to be considered is the general rule applicable to customs law that where a dutiable provision names an article without terms of

limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears (*Smillie & Co.* v. *United States*, 11 Ct. Cust. Appls. 199, T. D. 38966). The only expression of possible Congressional intent with regard to paragraph 332, *supra*, is found in the Summary of Tariff Information 1929 on the Tariff Act of 1922, compiled by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives in the preparation of the Tariff Act of 1930. It is there stated in volume I at page 716, and cited in defendant's brief, as follows:

### RIVETS, STUDS, AND STEEL POINTS

*Description and uses.*—Rivets are of two general types—solid and tubular or bifurcated. Solid rivets are *usually distinguished by the shape of the head* and have a wide variety of uses in the construction of boilers, machinery, ships, and structures. Bifurcated and tubular rivets are commonly made of copper or copper plated iron and are used in materials such as leather and cloth.

A stud is a kind of nail with a large head, used chiefly for ornament; also a short article of malleable iron, which in size and appearance, closely resembles a link cuff button. The latter kind of stud is used to join together two ends in machinery belts.

Steel points are small pieces of steel of different sizes in various patterns, such as rosettes, stars, arrows, etc., each having an iron shank. Their chief use is in the manufacture of buttons and cheap jewelry. [Italics supplied.]

Under the rule of the *Smillie* case, *supra*, nothing contained in the above-quoted excerpt from the Summary of Tariff Information would tend to exclude from the provision of paragraph 332, *supra*, for "rivets of iron or steel, not specially provided for," articles such as are here under consideration solely because they are headless and where the testimony discloses that the articles were designed and used as rivets in the manufacture of electric shavers, and the evidence is uncontradicted that that is their chief if not exclusive use.

Noting the variations in the definitions of "rivet," to which reference has been made above, and bearing in mind that dictionaries may be referred to not as evidence of the meaning of language but merely as "aids to the memory and understanding of the court," and considering the character, nature, form, shape, material of which made, and exclusive use of the imported commodity, we are of the opinion that the articles clearly respond to the popular conception of what are commonly known as rivets, and we so hold.

Therefore, the articles described on the invoice accompanying the entry in this protest as "Rotor Rivets" and "Stator Rivets," being in fact, in truth, and in substance, rivets within the meaning of that term as used in paragraph 332, *supra*, are properly dutiable at 1 cent per pound as "* * * rivets of iron * * *, not specially provided for."

*Prima facie* evidence of plaintiff's alternative claim under paragraph 330, *supra*, not having been produced at the hearing of this case, said claim need not be further considered, and it is hereby overruled.

Judgment will be entered in accordance with the views herein expressed.